**Complainant: The PEOPLE of The State of Colorado,**

**Respondent: Wilhemena Lawrence MITCHELL.**

**No. 05PDJ023.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Oct. 28, 2005.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2005.

On September 19, 2005, William R. Lucero, the Presiding Disciplinary Judge ("the Court"), held a Sanctions Hearing pursuant to C.R.C.P. 251.18(d). April M. Seekamp and James C. Coyle appeared on behalf of the Office of Attorney Regulation Counsel ("the People"). Wilhemena Lawrence Mitchell ("Respondent") did not appear, nor did counsel appear on her behalf. The Court issues the following Report, Decision, and Order Imposing Sanctions.

## REPORT, DECISION, AND ORDER IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.15(B).

*SANCTION IMPOSED: ATTORNEY DISBARRED*

### I. ISSUE

Disbarment generally is the appropriate sanction when a lawyer knowingly converts client property and causes injury or potential injury to a client. Respondent knowingly converted the funds of three separate clients, treated the funds as her own, and failed to refund any portion of the funds upon the termination of her representation. Respondent also failed to present any evidence to mitigate her misconduct. Is the presumptive sanction of disbarment appropriate under these circumstances?

### II. PROCEDURAL HISTORY AND BACKGROUND

Respondent failed to participate in any meaningful way from the outset of these proceedings. On April 4, 2005, after Respondent failed to show cause why she should not be immediately suspended, the Supreme Court approved the People's Petition for Immediate Suspension pursuant to C.R.C.P. 251.8. On August 18, 2005, the Court granted the People's Request for Sanctions in light of Respondent's willful failure to participate in the deposition process, file an adequate Answer,[1] and meaningfully participate in these proceedings as provided by the rules. The Court entered default in case number 05PDJ023, but stayed its order for ten days to give Respondent a final opportunity to participate. Respondent failed to take advantage of this final opportunity. Upon the entry of default, the Court deems all facts in the complaint admitted and all rule violations established. *People v. Richards,* 748 P.2d 341, 346 (Colo.1987).

The Court hereby adopts and incorporates by reference the factual background of this case fully detailed in the admitted Complaint.[2] Respondent essentially failed to meet her professional responsibilities when she knowingly converted client funds in three separate client matters. Respondent accepted funds from her clients pursuant to flat-fee agreements, failed to complete the work promised in these agreements, and treated the funds as her own by exchanging client checks for cash. In each client matter, Respondent failed to refund or provide an accounting for any portion of the unearned funds paid by her clients. The facts admitted through the entry of default constitute a violation of Colo. RPC 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation).

### III. SANCTIONS

The ABA Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) ("ABA *Standards* ") and Colorado Supreme Court case law are the guiding authorities for selecting and imposing sanctions for lawyer misconduct. Disbarment generally is appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client. ABA *Standard* 4.11. Dis-

---

1. Respondent filed a letter she previously submitted to the Attorney Regulation Committee as her answer to the People's complaint. When the Court denied the People's Motion for Judgment on the Pleadings, the Court ordered Respondent to file an amended Answer in compliance with the rules. She failed to file an amended Answer.

2. The Complaint is attached to this Report as Exhibit A.

barment is therefore the presumptive sanction in this case. The Court, however, must also examine the duty breached, the mental state of the lawyer, the injury or potential injury caused, and the aggravating and mitigating evidence pursuant to ABA *Standard* 3.0.

Respondent's failure to participate in these proceedings in a meaningful way leaves the Court with no other option but to consider only the allegations and rule violations set forth in the Complaint in evaluating the factors listed above. The Court finds Respondent breached her duties of diligence and honesty to her clients, the public, and the legal profession. The entry of default established that Respondent knowingly converted funds entrusted to her by her clients and treated them as her own. The facts established by the entry of default also support a finding of actual and potential harm to Respondent's clients, the public, and the legal profession.

The People alleged several aggravating factors including dishonest or selfish motive, a pattern of misconduct, bad faith obstruction of the disciplinary proceedings, refusal to acknowledge the wrongful nature of her conduct, substantial experience in the practice of law, and indifference to making restitution. At the Sanctions Hearing, the People presented testimony as to each of these aggravating factors from the three complaining former clients. They each reaffirmed the facts set forth in the People's Complaint, testified to the specific manner in which Respondent took advantage and treated them, and detailed the impact of their injuries. One of the former clients commented that Respondent not only failed to perform tasks she asked Respondent to complete, but also failed to show any respect for this Court or its orders. In the end, each former client asked the Court to disbar Respondent. Due in part to the absence of any contradictory evidence, the Court finds clear and convincing evidence to support each aggravating factor alleged by the People.

In the absence of significant mitigating factors, Colorado Supreme Court case law applying the ABA *Standards* holds disbarment is the presumptive sanction for conversion of client funds. Knowing conversion or misappropriation of client money "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *People v. Varallo*, 913 P.2d 1, 11 (Colo.1996). Neither the lawyer's motive in taking the money, nor the lawyer's intent regarding whether the deprivation is temporary or permanent, are relevant for disciplinary purposes. *Id.* at 10–11. Significant mitigating factors may overcome the presumption of disbarment, however, none are presented in this case. *See In re Fischer*, 89 P.3d 817 (Colo.2004) (finding significant facts in mitigation).

## IV. CONCLUSION

One of the primary goals of our disciplinary system is to protect the public from lawyers who pose a danger to them. The facts established in the Complaint reveal the serious danger Respondent poses to the public. She repeatedly failed to deal fairly and honestly with client funds. Converting client funds warrants serious discipline. Absent extraordinary factors in mitigation not presented here, the ABA *Standards* and Colorado Supreme Court case law applying the ABA *Standards* both support disbarment. Upon consideration of the nature of Respondent's misconduct, her mental state, the significant harm and potential harm caused, and the absence of mitigating factors, the Court concludes there is no justification for a sanction short of disbarment.

## V. ORDER

The Court therefore **ORDERS**:

1. WILHEMENA LAWRENCE MITCHELL, Attorney Registration No. 03526, is **DISBARRED** from the practice of law, effective thirty-one (31) days from the date of this Order, and her name shall be stricken from the list of attorneys licensed to practice law in the State of Colorado.

2. WILHEMENA LAWRENCE MITCHELL **SHALL** pay full restitution to her former clients and the Colorado

Attorneys' Funds for Client Protection in an amount to be determined at a future date. Timely payment of these amounts shall be a condition of readmission.

3. WILHEMENA LAWRENCE MITCHELL **SHALL** pay the costs of these proceedings. The People shall submit a Statement of Costs within fifteen (15) days of the date of this Order. Respondent shall have ten (10) days within which to respond.

## EXHIBIT A

COURT USE ONLY

Case Number: **05PDJ023**

April M. Seekamp, # 34194, Assistant Regulation Counsel, John S. Gleason, # 15011, Regulation Counsel, Attorneys for Complainant, 600 17th Street, Suite 200-South, Denver, Colorado 80202.

### COMPLAINT

THIS COMPLAINT is filed pursuant to the authority of C.R.C.P. 251.9 through 251.14, and it is alleged as follows:

### Jurisdiction

1. The respondent has taken and subscribed the oath of admission, was admitted to the bar of this court on October 2, 1973, and is registered upon the official records of this court, registration no. 03526. She is accordingly subject to the jurisdiction of this court. The respondent's last registered business address is P.O. Box 3371, Englewood, Colorado, 80155–3371.

### CLAIM I

[**A Lawyer Shall Not Engage In Conduct Involving Dishonesty, Fraud, Deceit Or Misrepresentation (Knowing Conversion)Colo. RPC 8.4(c) ]**

2. The respondent engaged in conduct involving dishonesty in violation of Colo. RPC 8.4(c) by converting unearned client funds to her own use.

### Burton Matter

3. Gwendolyn Burton hired the respondent in February 2003 to assist her with a suit against the Department of the Interior and related proceedings before the Equal Employment Opportunity Commission.

4. On Friday, February 21, 2003, Ms. Burton entered into a contract with the respondent which provided that the respondent would perform legal work on behalf of Ms. Burton in her suit against the Department of Interior. An attorney-client relationship was thus formed.

5. Ms. Burton entered into a flat fee agreement with the respondent which provided the representation would cost $12,000.00.

6. The fee agreement stated the flat fee was in exchange for amending the complaint, if appropriate, and representation in the hearing for Ms. Burton's case against the Department of Interior.

7. The fee agreement did not delineate any specific monuments of time as to when the flat fee or portions of the flat fee would be considered earned.

8. On February 21, 2003, the day she signed the fee agreement, Ms. Burton gave the respondent a $12,000.00 check for the fees.

9. The respondent provided Ms. Burton with a receipt which indicated the respondent had received $12,000.00 from Ms. Burton for the flat fee representation. The respondent signed the receipt.

10. The following Monday, February 24, 2005, the respondent exchanged the $12,000.00 check for cash.

11. At the relevant time, the respondent did not have a trust account. Accordingly, even after exchanging the funds for cash, the respondent did not deposit the funds into a trust account belonging to her.

12. The respondent did not have Ms. Burton's authority to treat the funds as her own.

13. The respondent exercised unauthorized dominion or ownership over unearned client funds which should have been held in trust until the respondent earned the funds.

14. The hearing for which the respondent was hired to represent Ms. Burton did not occur until February 2004, one year after the respondent was hired. Part of the hearing was conducted that month, but it was not completed due to a medical emergency Ms. Burton had. Accordingly, even a year after the respondent exchanged the check for cash, the entire flat fee had not been earned per the terms of the agreement.

15. On March 16, 2003, Ms. Burton paid the respondent $500.00 for costs.

16. The respondent endorsed the check to her daughter, Natasha Mitchell, and it was deposited into Natasha Mitchell's account.

17. The respondent treated the funds as her own by endorsing the check to her daughter, Natasha Mitchell.

18. Ms. Burton had not authorized the respondent to entrust the cost monies to a third party.

19. The respondent did not provide Ms. Burton any documentation contemporaneous with her receipt of the check or at any time thereafter to demonstrate any expenditure of costs.

20. On June 2, 2004, Ms. Burton faxed and sent via certified mail, a letter to the respondent stating the respondent had not completed the work for which she was hired and that the respondent needed to contact Ms. Burton.

21. On June 7, 2004, Ms. Burton had a phone conversation with the respondent in which the respondent told Ms. Burton she had come across some accounting paperwork and the respondent would be submitting a bill for $63,000.00 for attorney's fees in Ms. Burton's matter.

22. On June 9, 2004, Ms. Burton faxed and sent via certified mail a letter to the respondent terminating the representation. In the letter, Ms. Burton requested that the respondent immediately provide an accounting for charges associated with the case.

23. At the time Ms. Burton terminated the respondent's representation, the respondent had not completed the work Ms. Burton and the respondent agreed upon in the flat fee agreement.

24. The respondent never provided Ms. Burton with an accounting, and never refunded unearned fees or unused monies collected for costs or expenses.

25. Through the unauthorized exercise of dominion or ownership over Ms. Burton's funds, the respondent knowingly converted or misappropriated funds belonging to Ms. Burton.

26. Through her knowing conversion or misappropriation of Ms. Burton's funds, the respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation.

27. By such conduct, the respondent violated Colo. RPC 8.4(c).

### Goodson Matter

28. On May 12, 2003, Robert Goodson entered into a contract with the respondent which provided that the respondent would perform legal work on behalf of Mr. Goodson in his suit against the National Association of Letter Carriers. An attorney-client relationship was thus formed.

29. Mr. Goodson entered into a flat fee agreement with the respondent which provided the representation would cost $10,000.00 in fees.

30. The fee agreement stated that the flat fee was in exchange for Mr. Goodson's suit against the National Association of Letter Carriers.

31. The agreement provided that the flat fee would be paid in three installments of $3,333.00, with the first payment to be made on May 12, 2003, the second on August 22, 2003, and the third on December 18, 2003.

32. The fee agreement did not delineate any specific monuments of time as to when the flat fee or portions of the flat fee would be considered earned.

33. On May 12, 2003, the day he signed the contract, Mr. Goodson gave the respondent a check for $3,583.00. The check was for one third of the flat fee and for the respondent's consultation fee of $250.00.

34. The respondent gave Mr. Goodson a receipt which indicated she had received $3,583.00 from him which represented a $250.00 initial consultation fee and the $3,333.00 initial one third of the $10,000.00 flat fee. The receipt was signed by Ms. Mitchell.

35. The respondent exchanged the check for cash on May 12, 2003, the same day Mr. Goodson gave her the check.

36. At the relevant time, the respondent did not have a trust account. Accordingly, even after exchanging the funds for cash, the respondent did not deposit the funds into a trust account belonging to her.

37. The respondent did not have Mr. Goodson's authority to treat the funds as her own.

38. The respondent exercised unauthorized dominion or ownership over unearned client funds which should have been held in trust until the respondent earned the funds.

39. On June 6, 2003, Mr. Goodson gave the respondent a check for $500.00 for costs. The check was endorsed to the respondent's daughter, Natasha Mitchell.

40. The respondent treated the funds as her own by endorsing the check to her daughter, Natasha Mitchell.

41. Mr. Goodson had not authorized the respondent to entrust the cost monies to a third party.

42. The respondent did not provide Mr. Goodson any documentation contemporaneous with her receipt of the check, or at any time thereafter, to demonstrate any expenditure of costs.

43. On June 27, 2003, the respondent filed the complaint in Mr. Goodson's case in federal district court and paid the $150.00 filing fee in cash. The respondent never accounted to Mr. Goodson for that payment or the remaining $350.00 of his cost money.

44. On Friday, August 22, 2003, Mr. Goodson gave the respondent a check for $3,333.00 for the second installment of the flat fee. Mr. Goodson gave the respondent the check late in the afternoon.

45. The respondent sent Mr. Goodson a letter dated August 22, 2003, acknowledging her receipt of the second installment.

46. The check was exchanged for cash on the following Monday, August 25, 2003.

47. When the respondent exchanged the second installment of Mr. Goodson's payment for cash, she had not completed the representation as per the fee agreement and did not have the respondent's authorization to treat the funds as her own.

48. The third fee installment was due on December 18, 2003; however, by that time, Mr. Goodson was considering terminating the respondent's representation because he was concerned about her failure to communicate with him. Mr. Goodson ultimately decided not to fire the respondent because of the financial investment in attorney's fees he had already made.

49. On January 7, 2004, Paul Baca, the respondent's legal assistant picked up the check for the third installment of $3,333.00 from Mr. Goodson at his work.

50. The respondent sent Mr. Goodson a letter dated January 12, 2004, ac-

knowledging her receipt of the third installment.

51. The check was exchanged for cash on January 7, 2004, the same day Mr. Goodson gave the check to Mr. Baca.

52. At that time, the representation had not been completed; accordingly, Mr. Goodson had not authorized the respondent to exchange the third installment payment for cash and treat it as her own.

53. On September 13, 2004, after the respondent requested that Mr. Goodson provide her with $6,000.00 for deposition costs and requested that he pay her another $500.00 for expenses, claiming the initial $500.00 had run out, Mr. Goodson requested that the respondent provide him with a detailed accounting. This request was sent to the respondent by email.

54. The respondent replied to Mr. Goodson via email and told Mr. Goodson her contract did not require her to provide him with an accounting.

55. On October 5, 2004, Mr. Goodson sent the respondent a letter via certified mail terminating the respondent's representation. In the letter, Mr. Goodson requested that the respondent return his file and provide him with an itemized billing of services the respondent had provided.

56. At the time Mr. Goodson terminated the respondent, the respondent had not completed the work Mr. Goodson and the respondent agreed upon in the flat fee agreement.

57. Through the unauthorized exercise of dominion or ownership over Mr. Goodson's funds, the respondent knowingly converted or misappropriated funds belonging to Mr. Goodson.

58. Through her knowing conversion or misappropriation of Mr. Goodson's funds, the respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation.

59. By such conduct, the respondent violated Colo. RPC 8.4(c).

### Perea Matter

60. In April 2003, Mr. Perea hired the respondent to assist him in filing suit against the National Association of Letter Carriers. Mr. Perea entered into a flat fee agreement with the respondent which provided Mr. Perea would pay the respondent a $10,000.00 flat fee and $500.00 for costs; in the event of litigation, costs were estimated to be $5,000.00. An attorney-client relationship was thus formed.

61. Ms. Sandra Perea ("Sandy Perea"), Mr. Perea's sister-in-law, also hired the respondent to represent her shortly after Mr. Perea hired the respondent. Mr. Perea paid for the respondent's representation of Sandy Perea as well.

62. The fee agreement for Mr. Perea's case stated that the flat fee was in exchange for litigation against the National Association of Letter Carriers.

63. The agreement provided that the flat fee would be paid in three installments, the first in the amount of $3,000.00 to be paid on April 10, 2003, and the second and third payments each in the amount of $3,500.00, to be paid on July 4, 2003, and October 4, 2003.

64. The fee agreement did not delineate any specific monuments of time as to when the flat fee or portions of the flat fee would be considered earned.

65. On April 11, 2003, the day Mr. Perea signed the contract, he gave the respondent a check for $3,000.00 as the first installment of the flat fee. Mr. Perea also paid the respondent $500.00 for expenses.

66. The respondent provided Mr. Perea with a receipt. Although the receipt was initially incorrect, the respondent changed it to reflect the fact that she received $3,000 for the initial payment on the $10,000 flat fee and that she received $500.00 for costs. The respondent signed the receipt.

67. The respondent deposited the $3,000.00 check Mr. Perea gave her into a bank account. At the relevant time, the respondent did not have a trust account. Accordingly, Mr. Perea's funds were not deposited into a trust account belonging to the respondent.

68. The respondent did not have Mr. Perea's authority to treat the funds as her own.

69. The respondent exercised unauthorized dominion or ownership over unearned client funds which should have been held in trust until the respondent earned the funds.

70. The respondent endorsed the $500.00 check Mr. Perea gave her for costs to her daughter, Natasha Mitchell.

71. The respondent treated the funds as her own by endorsing the check to her daughter.

72. Mr. Perea had not authorized the respondent to entrust the cost monies to a third party.

73. On April 24, 2003, the respondent filed the complaint in Mr. Perea's case in federal district court and paid the $150.00 filing fee in cash.

74. In May 2003, Sandy Perea hired the respondent. Mr. Perea agreed to pay his sister-in-law's attorney's fees. He paid the respondent $3,500.00 as the first installment. The check was deposited into the respondent's bank account. At the relevant time, the respondent did not have a trust account. Accordingly, the funds were not deposited into a trust account belonging to the respondent.

75. On July 9, 2003, Mr. Perea paid the respondent his second installment payment of $3,500.00 for his case.

76. The respondent treated the funds as her own by endorsing the check to her daughter, Natasha Mitchell.

77. Mr. Perea had not authorized the respondent to entrust the monies to a third party.

78. On August 7, 2003, Mr. Perea paid the respondent $500.00 for costs in Sandra Perea's case.

79. On September 1, 2003, Mr. Perea paid the respondent $2,000.00 for the second installment in Sandy Perea's case.

80. On October 4, 2003, Mr. Perea paid the respondent the third installment of $3,500.00 due in his case. The check was endorsed to the respondent's daughter, Natasha Mitchell.

81. The respondent treated the funds as her own by endorsing the check to her daughter.

82. Mr. Perea had not authorized the respondent to entrust the monies to a third party.

83. On October 22, 2003, a court reporter from Avery Woods Reporting ("Avery") took the deposition of John Fechisin. The respondent did not order the deposition transcript at that time. As of October 31, 2003, the respondent owed Avery $192.50 for the deposition.

84. On October 23, 2003, Mr. Perea was deposed. The respondent informed Mr. Perea she would need a check for $4,000.00 to cover the cost of his deposition.

85. After Mr. Perea learned from the court reporter that the cost of the deposition would be between $400.00 and $600.00, he gave the respondent a check for $600.00.

86. The check was endorsed to the respondent's daughter, Natasha Mitchell.

87. The respondent treated the funds as her own by endorsing the check to her daughter.

88. Mr. Perea had not authorized the respondent to entrust the cost monies to a third party.

89. The respondent knew she was not authorized to treat the funds as her own and that Mr. Perea provided the check to her for the limited purpose of paying deposition costs in his case. At the time he gave her the check,

Mr. Perea and the respondent had just discussed the fact that Mr. Perea was not going to loan the respondent money as she requested because Mr. Perea was angry with the respondent for lying to him about the deposition costs, and thus the respondent knew Mr. Perea had not authorized her to treat the costs funds as her own.

90. Mr. Perea's deposition was completed by a court reporter from Boverie, Jackson, Busby and La Fera ("Boverie") and cost $570.80. The invoice from Boverie was dated October 28, 2003. Boverie was paid with two money orders both dated November 6, 2003, that the respondent's daughter, Natasha Mitchell, purchased from King Soopers.

91. From October 31, 2003, the approximate date the respondent endorsed the $600.00 check to her daughter, until November 6, 2003, when the Boverie money orders were purchased, the respondent exercised unauthorized dominion over Mr. Perea's money.

92. During October and November, Mr. Perea requested copies of his deposition and John Fechisin's deposition from the respondent. Initially the respondent refused to let Mr. Perea review his own transcript; after Mr. Perea told the respondent he needed to review the transcript for the court reporter, she sent him a copy which he received on November 30, 2003.

93. At the end of November, Mr. Perea had a phone conversation with the respondent in which she told him she would need $2,500.00 in hand on December 2, 2003 for Sandy Perea's case.

94. At the beginning of December, Mr. Perea had a conversation with the respondent in which Mr. Perea inquired as to whether a witness in his case had been served. The respondent informed Mr. Perea the witness had not been served because Mr. Perea had an outstanding balance with the court reporting firm, Avery Woods Reporting. When Mr. Perea disputed the logic of the respondent's suggestion, they argued and the respondent threatened to quit Mr. Perea's case as well as Sandy Perea's case.

95. Shortly thereafter, Mr. Perea met with the respondent's legal assistant, Paul Baca. Mr. Baca agreed to serve the witness Mr. Perea had discussed with the respondent. Mr. Perea gave Mr. Baca two checks: one for $2,500.00 for Sandy Perea's case and one for $2,000.00 for his own case. Mr. Perea instructed Mr. Baca that if the witness was not served, the two checks should be returned to Mr. Perea. The following day, Mr. Baca served the witness Mr. Perea had been concerned about and Mr. Baca gave the two checks to the respondent.

96. The $2,500.00 check Mr. Perea provided for Sandy's case was deposited into the respondent's bank account. At the relevant time, the respondent did not have a trust account. Accordingly, Mr. Perea's funds were not deposited into a trust account belonging to the respondent.

97. The respondent endorsed Mr. Perea's $2,000.00 check for deposition costs to her daughter, Natasha Mitchell.

98. The respondent treated the funds as her own by endorsing the check to her daughter.

99. Mr. Perea had not authorized the respondent to entrust the cost monies to a third party. The respondent knew that Mr. Perea provided the check to her for the limited purpose of paying costs in his case and that he had not authorized the respondent to treat the money as her own.

100. On December 5, 2003, the respondent paid a $2,000.00 deposit to Avery for Mr. Perea's case.

101. Around December 8, 2003, Mr. Perea told the respondent he realized he had overpaid the respondent $500.00 at the beginning of the month when

he paid the third installment in Sandy's case. He requested a refund of the $500.00.

102. The respondent refused to refund the money and told Mr. Perea she needed it for costs in Sandy's case.

103. On December 8 and 9, 2003, Avery took the depositions of Timothy Murphy, Russell Shamah, Tim Mikita, and David Johnson in Adrian Perea's case.

104. As of December 30, 2003, the total amount due for those depositions was $1,223.50. Avery applied the $2,000.00 deposit to the bill. Avery also deducted the respondent's outstanding balance of $192.50 (Fechisin deposition) which left a remaining credit of $584.00.

105. On December 10, 2003, Avery took the depositions of Russ Shamah and Jeffrey Hartman. A transcription fee for Adrian Perea was also included on the bill.

106. As of January 13, 2004, after applying the remaining credit balance of $584.00, the balance due Avery was $865.70. The respondent paid Avery the balance of $865.70.

107. On January 14, 2004, the respondent called Mr. Perea and told him he needed to provide her with a check for $4,500.00 so she could pay his bill to Avery.

108. When Mr. Perea questioned the respondent as to what had happened to the money he gave her in December, she said it had already been spent.

109. Mr. Perea told the respondent he did not have the money.

110. The respondent referenced another settlement Mr. Perea had received in a separate suit and told him he was being uncooperative given that he had $57,000.00 in the bank.

111. The respondent told Mr. Perea to send her a check for $700.00 immediately, so she could pay Avery by Friday, January 16, and to send the remaining $3,800.00 so she could give the remainder to Avery on Monday, January 19.

112. Mr. Perea sent the respondent a check for $2,000.

113. The respondent endorsed the check to her daughter, Natasha Mitchell.

114. The respondent treated the funds as her own by endorsing the check to her daughter.

115. Mr. Perea had not authorized the respondent to entrust the cost monies to a third party. The respondent knew that Mr. Perea provided the check to her for the limited purpose of paying costs in his case and that he had not authorized the respondent to treat the money as her own.

116. The respondent spoke to Mr. Perea the following day, January 15, 2004, to verify he had sent the money.

117. When Mr. Perea told the respondent he had sent $2,000.00 instead of $700.00, but that he was not sending more, the respondent told Mr. Perea she had spoken to Avery and that they said they had substantially overestimated the amount due and that a refund was due him.

118. The respondent misrepresented to Mr. Perea the amount due to Avery, telling him on January 14, 2004 that $4,500.00 was due when Avery was actually only owed $865.70.

119. Mr. Perea attempted to get in touch with the respondent to inquire about the refund and spoke to her daughter, Natasha Mitchell, a couple of times.

120. Natasha Mitchell informed Mr. Perea that her mother had not sent him a refund because Avery had not transcribed Mr. Fechisin's deposition and when they did, Ms. Mitchell would do an accounting and give Mr. Perea a refund. Natasha Mitchell told Mr. Perea this numerous times from the end of January to the beginning of March 2004.

121. On or around March 22, 2004, Mr. Perea contacted Avery and discovered that the Fechisin transcript had not been ordered until February 2004.

122. Mr. Perea called the respondent and spoke to the respondent's daughter, Natasha Mitchell.

123. Mr. Perea told Natasha Mitchell he doubted the information regarding the transcripts and that he wanted his $2,000.00 back. He told her that when Avery sent a bill, Mr. Perea would then pay the respondent the exact amount of the bill. Natasha Mitchell became angry and hung up on Mr. Perea.

124. On March 31, 2004, the respondent sent an email addressed to Mr. Perea to Sandy Perea's email account. In her email she indicated that the deposition monies would be used to make copies for Mr. Perea, the respondent's legal assistant, Paul Baca, and opposing counsel.

125. The respondent already had an agreement with the opposing counsel that the respondent would make copies at a cost to opposing counsel of $0.18 per page.

126. The respondent misrepresented to Mr. Perea that he was responsible for paying for opposing counsel's copy costs.

127. On April 9, 2004, the respondent paid Avery $487.25 for the Fechisin transcript.

128. On May 12, 2004, Mr. Perea sent the respondent a certified letter requesting that she account for the $4,600.00 he had paid to the respondent for deposition costs.

129. By letter dated June 4, 2004, the respondent replied to Mr. Perea's certified letter. The respondent stated that Mr. Perea was charged at a rate of $0.25 per page for the deposition transcripts. She also told him he owed her $95.00 for copies pertaining to the summary judgment reply.

130. On June 11, 2004, Mr. Perea sent the respondent a certified letter terminating her representation.

131. In the letter, Mr. Perea requested the respondent return his file and provide him with a complete accounting of the costs and expenses incurred on his behalf.

132. At the time Mr. Perea terminated the respondent's representation, the respondent had not completed the work that the respondent and Mr. Perea had agree to in the flat fee agreement.

133. The respondent never provided Mr. Perea with an accounting, and never refunded unearned fees or unused monies collected for costs or expenses.

134. The respondent converted approximately $1,026.25 of the cost retainer in Mr. Perea's case as described below. The respondent also converted unearned fees.

135. Mr. Perea paid the respondent a total of $5,100.00 for costs in his case.

136. The respondent paid a total of $4,073.75 in costs in Mr. Perea's case.

137. The respondent never accounted for the $1,026.25 cost balance in Mr. Perea's case despite his request that she provide him an accounting and return unused portions of the monies for costs.

138. Through the unauthorized exercise of dominion or ownership over Mr. Perea's funds, the respondent knowingly converted or misappropriated funds belonging to Mr. Perea.

139. Through her knowing conversion or misappropriation of Mr. Perea's funds, the respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation.

140. By such conduct, the respondent violated Colo. RPC 8.4(c).

WHEREFORE, the people pray that the respondent be found to have engaged in misconduct under C.R.C.P. 251.5 and the Colorado Rules of Professional Conduct as specified above; the respondent be appropriately disciplined for such misconduct; the respondent be required to make restitution to the client protection fund pursuant to C.R.C.P. 252.14(b), and/or return client files to the former clients and that the respondent be required to take any other remedial action appropriate under the circumstances; and the respondent be assessed the costs of this proceeding.